NATIONAL CONTRACTING COMPANY *vs.* VULCANITE
PORTLAND CEMENT COMPANY.

VULCANITE PORTLAND CEMENT COMPANY *vs.* NATIONAL
CONTRACTING COMPANY.

Suffolk.    March 29, 1906. — June 19, 1906.

Present: KNOWLTON, C. J., MORTON, LATHROP, BRALEY, & SHELDON, JJ.

*Contract*, Construction, Performance and breach.    *Evidence*, Extrinsic affecting writings.    *Usage*.

If a contract in writing for the sale of goods contemplating various shipments names no times of payment the price of each shipment is payable on delivery.

If a contract in writing for the sale of goods contemplating various shipments names no times of payment, so that its legal effect is to make the price of each shipment payable on delivery, it may be shown that the parties to the contract by their conduct in regard to the bills that were rendered for the various shipments and their payment modified the legal effect of the contract so as to make the terms of payment cash in thirty days after the delivery of each shipment.

In an action on a contract in writing for the sale of goods contemplating various shipments, if it appears that the contract named no times of payment so that its legal effect was to make the price of each shipment payable on delivery but that all the bills were made out by the seller with a statement to the effect that payment should be in cash thirty days after the delivery of each shipment and that the buyer never objected to this and acted in a way to indicate that he adopted this modification of the contract, a finding is warranted that the contract was so modified.

In an action against a manufacturer of cement for alleged failure to deliver cement in various shipments as required by a contract with the plaintiff containing no provision as to times of payment, the defendant may show that it was "a usual custom" of the cement trade at the place of delivery, when cement was sold by manufacturers to consumers and no special agreement was made as to times of payment, to make payments in thirty days after delivery.

Under a contract for the sale of goods to be delivered in various shipments and paid for in cash thirty days after the delivery of each shipment, if the buyer is behindhand in his payments the seller may refuse to deliver more goods until the goods already delivered are paid for in accordance with the terms of the contract.

One who contracts for the purchase of goods by instalments has no right to demand a continued delivery of the goods and at the same time withhold payments due for instalments already received to protect himself from anticipated breaches of contract by the seller.

TWO ACTIONS OF CONTRACT by the respective parties to an agreement in writing printed below, for alleged breaches of that

contract. Writs dated respectively August 20 and September 19, 1902.

The agreement in writing was as follows:

"Boston, Nov. 7, 1901.

" The National Contracting Co.,
    "70 Kilby St., Boston.
" Dear Sirs:—

    " The undersigned, the Vulcanite Portland Cement Co., hereby offer to furnish you, F. O. B. cars at Quincy, Mass., and at East Milton, Mass., all of the Portland cement which 'you may require for building Sections 52, 53 and 54 of the High Level Sewer, Boston, for $1.50 per barrel. ·

    " This offer is made with the understanding that we will allow you 5c each for all sacks returned to us in good condition F. O. B. cars at Vulcanite, Warren County, N. J.; that we will promptly remove at our own expense any cement that may be condemned by the engineer of the Metropolitan Water & Sewerage Board; and that you will be free to purchase cement from other parties in such quantities as may be necessary to keep your work going uninterruptedly in case the engineer of the Metropolitan Water & Sewerage Board will not allow our cement to be used in the works while tests of it are being made or for other cause.

            " Very truly yours,
                " Vulcanite Portland Cement Co.,
                    " B. F. Stradley,
                            "Secretary."

" Accepted by
    " The National Contracting Co.,
        " By M. W. Cooley,
            " Manager."

The course of the proceedings and the material facts are stated or described in the opinion. After the filing of an auditor's report the cases were tried together in the Superior Court before *Hardy*, J., without a jury.

The auditor's report among other things contained the following findings in regard to the time for payments:

" The contract of November 7, 1901, did not specify the time

when payments should be made by the National Company for cement delivered by the Vulcanite Company, and, as above stated, I find that no express agreement was ever made by the parties as to when such payments should be made.

" On the last day of each month the Vulcanite Company sent to the National Company a statement of the amount due for shipments during the month; and this statement was sent each month whether any cement had been shipped during the month or not, if at the time there was anything due on account of previous shipments.

" On the day following each shipment an invoice thereof was sent to the National Company. All of these invoices (about forty in number) were received by the National Company and had on their face the following words: — ' Terms: Net 30 days.' The three words, ' Net 30 days ' were conspicuously stamped on the invoices with red ink. The National Company never made any objection to these terms.

" If the facts are material, I find that in the year 1900, the Vulcanite Company sold and delivered to the National Company eight thousand five hundred barrels of cement. There was no agreement between the parties as to when payments or deliveries should be made. Cement was shipped in May, June, July, August, September and October, 1900. The May shipments, of which the average date was May 18, were paid for by the National Company on June 18. The June shipments, of which the average date was June 24, were paid for on July 25. The July shipments, of which the average date was July 10, were paid for on August 27. The August shipments, of which the average date was August 16, were paid for on September 27. The September shipments, of which the average date was September 25, were paid for on October 20. The October shipments, of which the average date was October 3, were paid for on November 20.

" If material, I also find that during the period covering the transactions involved in these cases and for some years prior thereto it was a usual custom of the cement trade in Boston, where cement was sold by manufacturers to consumers and no special agreement was made as to the time of payments, for payments to be made for said cement in thirty days after delivery.

"On all the evidence as above stated, I find that soon after the contract of November 7, 1901, was executed and performance thereof begun, it came to be understood and impliedly agreed between the parties that payments for cement delivered by the Vulcanite Company should be paid for by the National Company in thirty days after delivery."

The National Contracting Company, called in the opinion the plaintiff, asked the judge to rule as follows:

"First: To confirm the following rulings of the auditor. That under the circumstances existing after July 1, 1902, the National Company was justified in declining to make further payments until its orders for cement were complied with; and that if it was not so justified, its failure to make payments as requested was not such a breach of the contract as justified the refusal of the Vulcanite Company to go on with it.

"That the National Company is entitled to recover the damages caused it by the failure of the Vulcanite Company to deliver the cement required by the National Company for its work; and that such damage is the difference between what the National Company paid for five thousand six hundred and seventy-three and three fourths barrels of cement in the market, — this sum being as already stated, the fair market price, — and the price named in the contract.

"That under the practice established in this Commonwealth (*Star Glass Co.* v. *Morey*, 108 Mass. 570) the cases having been tried together the damages in the action for breach of contract (the first case) should first be applied to cancel the sum due the Vulcanite Company for the cement delivered, and there should be a finding for the plaintiff in the first case (the National Company) for the balance. Applying the above rule that the Vulcanite Company, the plaintiff in the second case, is not entitled to recover and that the National Company, the plaintiff in the first case, is entitled to recover the amount as found by the auditor.

"Second: That the facts found by the auditor and evidence relating thereto as to transactions between the parties in 1900 are immaterial and inadmissible.

"Third: That the facts found by the auditor as to 'a usual custom' are immaterial and inadmissible.

"Fourth: That the finding of the auditor that 'it came to be understood and impliedly agreed between the parties' that payments should be made in thirty days, is immaterial."

The judge refused to make any of these rulings.

The Vulcanite Portland Cement Company, called in the opinion the defendant, asked the judge to rule as follows:

"1. That no time being specified in the writing of November 7, 1901, for deliveries, deliveries must be made within a reasonable time, to be determined with reference to the circumstances expressly mentioned in the contracts between the plaintiff and the Metropolitan Board and the Vulcanite Company and in correspondence, to wit, the uninterrupted building of the sewer.

"2. That as nothing is said in the writing of November 7, 1901, with reference to payments, the necessary construction would be, payment on delivery of each shipment, unless by oral evidence which throws light upon the facts and the subject matter, it appears that the parties well understood and acted upon the understanding that payments were not to be cash on delivery but were to be made in thirty days from shipment, in which event there is to be written into the writing of November 7, 1901, the terms of payment actually intended by the parties, to wit, thirty days after delivery.

"3. That any given failure by the Vulcanite Company to insist upon payments as agreed '30 days' was not, as matter of law, a waiver of the right to decline subsequently to make further deliveries because of the refusal of the plaintiff to pay for such past deliveries.

"4. The defendant had the right on July 9 and any time thereafter while the plaintiff continued in default as to payment for past deliveries, to refuse further deliveries, if under all the circumstances the defendant might reasonably conclude that the failure to pay was chronic and would continue to be so. In such a state of things the defendant was not obliged to continue to deliver.

"5. Whether as matter of law the plaintiff did or did not repudiate the contract is immaterial, for even if it had not repudiated, there may have been, upon the facts, such a breach by its failure to pay, as justified the refusal by the defendant to go on with it."

The judge made the second, third, fourth and fifth rulings as requested, and made the first ruling as far as and including the words "reasonable time." As bearing upon the rest of this ruling as requested, he mentioned a finding of the auditor that the defendant did not know the specific terms of the contracts referred to in the request previous to November 7, 1901.

The judge made a memorandum of findings in the first case in part as follows:

"The defendant company on November 7, 1901, had no specific knowledge of the provisions of the contract between the plaintiff and the metropolitan board. The contract of November 7, 1901, indefinite as to time of payment and delivery, vaguely states that there is to be furnished 'all of the Portland cement which you may require,' etc. The auditor found that such cement was to be used by the plaintiff in its work under said contracts and that the amount required would be five thousand barrels or more, so far as the defendant knew or was informed by the plaintiff during the negotiation of the contract. In the absence of any other contract, correspondence or conversation between the parties this might have meant any amount above five thousand barrels or about that amount. In the letter of July 12, 1902, . . . the defendant stated that it supposed from Mr. Cooley's figures given to Mr. Stradley that five thousand six hundred barrels would complete the work. Before May 1, 1902, six thousand two hundred and fifteen barrels were delivered in such manner as to cause no complaint. Upon this evidence indicating an uncertainty as to the amount that would be required and the other findings and facts in testimony stated in the report I do not find that there was a waiver by the defendant of the conditions as to payment of the amounts of the indebtedness overdue from the plaintiff. The correspondence on the part of the defendant before July 12, 1902, is as consistent with the fact that it may have understood that it had furnished much more cement than was supposed originally to be required by both parties as with any fact alleged in argument by the plaintiff to show any other motive. On the facts and circumstances in evidence as reported by the auditor and as heard by me I do not agree with his findings that the defendant was in default."

In the first case the judge found for the defendant. In the

second case, in which the Vulcanite Portland Cement Company was the plaintiff, the judge found for the plaintiff in the sum of $3,235.99. The National Contracting Company alleged exceptions in both cases.

*F. W. Grinnell*, for the National Contracting Company.

*G. L. Huntress*, for the Vulcanite Portland Cement Company.

KNOWLTON, C. J. The first of these cases is an action brought to recover damages for a refusal of the defendant to furnish to the plaintiff a quantity of Portland cement according to the terms of a contract in writing made by the parties. The second is an action by the defendant in the first action to recover from the plaintiff in that action the price of cement delivered under this contract. The cases were heard before an auditor who found for the plaintiff in the first action, whom we will hereinafter call the plaintiff, and he allowed, in diminution of the plaintiff's claim, the amount due for cement delivered to the defendant in the first action, who will hereinafter be called the defendant. The case was afterwards tried before a judge without a jury, no evidence being introduced except the auditor's report, and such evidence, documentary and oral, as either party chose to offer of that which previously had been received by the auditor. The judge reversed the decision of the auditor and found for the defendant, holding the plaintiff liable for the price of that which was delivered and not paid for. The contract signed by the parties was silent as to the time of payment. The legal effect of the contract was, therefore, to make the price of the goods payable on delivery. *Fessenden* v. *Mussey*, 11 Cush. 127. *Stephenson* v. *Cady*, 117 Mass. 6. *Morton* v. *Clark*, 181 Mass. 134. Both the auditor and the judge found that the parties subsequently, by their conduct in regard to the various shipments made and bills rendered and payments of the bills, impliedly agreed with each other that the writing should be modified in its legal effect in this particular, and that the terms of payment should be cash in thirty days after the delivery of each shipment. All the bills were made with a statement to this effect, and the plaintiff never objected to it, but acted in a way to indicate that it adopted this modification of the contract proposed by the defendant. We are of opinion that this finding was well warranted by the evidence.

By the contract the defendant agreed to furnish all the Port-
land cement that the plaintiff might require for building sections
fifty-two, fifty-three and fifty-four of the high level sewer, Bos-
ton, for $1.50 per barrel. The fair interpretation of the contract
is that the cement was to be furnished from time to time upon
orders, as needed, within a reasonable time after the receipt of
the orders. The contract was dated November 7, 1901. Cement
was ordered and delivered under the contract from time to time
after that date, the last shipment being in June, 1902. On May
28, 1902, the defendant wrote to the plaintiff that, on account
of a failure to obtain completion of its mill, number three,
by May first, as it had expected to, it was extremely short of
cement and much behind with its orders, and it asked for one
month's notice of shipments required in the future, and inti-
mated that for a time it would not be able to fill orders promptly.
On May 31, 1902, the defendant had orders from the plaintiff
for thirteen hundred barrels, then unfilled. From that time the
defendant failed to send all the cement ordered, and thus caused
the plaintiff some inconvenience; but up to July 18 the plaintiff
did not attempt an enforcement of its rights in this particular,
and tried to get on as well as possible with such performance as
the defendant was able to give. In the meantime the plaintiff
was considerably behind in its payments, but the defendant
made no serious complaint about it, although the judge found
as a fact that it did not waive its legal right to payment accord-
ing to the modified contract.

The crisis came when, on July 18, the defendant being much
behind in its shipments and the plaintiff being much behind in
its payments, the plaintiff wrote to the defendant, demanding
prompt shipments in accordance with its orders, and stating that
on the defendant's failure to fill the orders promptly, it should
buy in the market and charge the defendant with the excess
above the contract price. The market price of cement had risen
considerably after the date of the contract. To this letter the
defendant replied on July 21, demanding payment of so much
of the account as was overdue, with prompt remittances in the
future. In this letter the defendant stated that it would make
no more shipments until it received payment for the two items
which were then overdue. The plaintiff answered this letter on

July 23, 1902, demanding the filling of its orders for cement, stating that it had already been obliged to buy elsewhere at considerable expense in order to go on with the work, and declining to pay the overdue account, and proposing to hold the money as security for damages already suffered and that might afterwards be suffered from the defendant's breach of the contract. As a result of the attitude thus taken by the respective parties these actions were brought.

Up to the time of the writing of the defendant's letter of July 21, demanding payment of the overdue account and refusing to deliver any more cement until this should be paid, the plaintiff made no claim upon the defendant for damages caused by the delay in filling orders, and it does not appear that the plaintiff had suffered any substantial damages. Upon the evidence, the judge might well find that the plaintiff waived any claim that it might have made on account of the defendant's default up to that time. Of course it had a right to insist upon perfect performance in the future ; but the plaintiff's failure to pay for the cement when the bills were due left the defendant with a right to insist at any time that these payments should be made. Such payments might be demanded as a condition precedent to the delivery of any more cement. *Eastern Forge Co.* v. *Corbin,* 182 Mass. 590, 593. *National Machine & Tool Co.* v. *Standard Shoe Machinery Co.* 181 Mass. 275, 279. *Stephenson* v. *Cady,* 117 Mass. 6. *Wilkinson* v. *Blount Manuf. Co.* 169 Mass. 374. The defendant made its demand, and stood on its right to have pay before making any more deliveries. The plaintiff sought to hold the money as security for damages from possible breaches of the contract by the defendant in the future.

We think it quite plain that the plaintiff could not lawfully do this. It could not be known that there would be any breach of the contract of the defendant in the future if the plaintiff made the payments then due and afterwards paid promptly. One who contracts for the purchase of goods by instalments cannot lawfully demand performance of the contract, and at the same time withhold payments due for instalments already received in order to protect himself from anticipated breaches of the contract by the seller. *Stephenson* v. *Cady,* 117 Mass. 6, 9, 10. *Spaulding* v. *Backus,* 122 Mass. 553. *Wiley* v. *Bunker Hill*

*National Bank*, 183 Mass. 495. The technical insolvency of the plaintiff, because of large advances of money by the corporation that owned most of its capital stock, did not affect the defendant's rights in this particular. So far as appears, this condition did not interfere with the plaintiff's performance of its contracts, made in the usual course of its business. *Hobbs* v. *Columbia Falls Brick Co.* 157 Mass. 109. *Jewett Publishing Co.* v. *Butler*, 159 Mass. 517. *Spaulding* v. *Backus*, 122 Mass. 553. *Wiley* v. *Bunker Hill National Bank*, 183 Mass. 495.

Upon the findings of the judge, the first request of the plaintiff for a ruling was rightly refused. The second, third and fourth requests of the plaintiff were also rightly refused. The matters referred to in them were all proper for consideration on the question whether the parties, after the making of the contract, by the new arrangement impliedly agreed that the payments might be made at the expiration of thirty days' credit. If, as the plaintiff argues, under a contract calling for cash on delivery, the effect upon the rights of the parties of delivering goods without payment at the time might be different as to future performance without payment of the goods already delivered, from the effect of such deliveries without payment when payments are due under a contract giving a specified credit, then the change in the time for payment was material. If the law is the same when the contract calls for cash on delivery as when the sales are on credit, these matters did the plaintiff no harm.

The rulings given in accordance with the defendant's requests are covered by what we have already said. In both cases the entry will be

*Exceptions overruled.*